## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **CRIMINAL NO.:** |
| | ) | |
| v. | ) | |
| | ) | **VIOLATIONS:** |
| YOSSI AVITAN, | ) | |
| ORI SAADON, | ) | **18 U.S.C. § 371** |
| ITZHAK SALAMA, | ) | **(Conspiracy)** |
| GOLAN CHKECHKOV, | ) | **18 U.S.C. § 1960(a), (b) and (c);** |
| MICHAEL ADMON, and | ) | **(Operating an Unlicensed Money** |
| HAVIV ARAZI, | ) | **Transmitting Business);** |
| | ) | **18 U.S.C. § 2 (Aiding and Abetting,** |
| | | **Causing an Act to Be Done);** |
| | | |
| | | **FORFEITURE ALLEGATION:** |
| | | |
| | | **18 U.S.C. § 982(a)(1); 21 U.S.C. § 853(p); 28 U.S.C. § 2461(c)** |
| | ) | |
| _____ | ) | **UNDER SEAL** |

## INDICTMENT

The Grand Jury charges that:

At all times relevant to this Indictment:

### Introduction

### Hawala Money Transmitting Networks

1.      A "hawala" is an alternative money transmitting system conducted by brokers known as "hawaladars" that operates outside of the traditional banking and financial systems and is premised on relationships of mutual trust.   The hallmark of a hawala is the transfer and receipt of the value of currency without its actual physical movement.

2.      In its most basic form, a hawala network involves at least two hawaladars.   A customer approaches a hawaladar and gives the hawaladar a sum of money to be transferred to the beneficiary in another city/country.   The hawaladar then contacts a hawaladar in the

recipient city/country, instructs this individual to deliver equivalent funds, minus a fee, in the recipient country's currency to the beneficiary, and promises to settle the debt between the two hawaladars at a later time.   The hawaladar in the recipient city/country then contacts the beneficiary, confirms that the beneficiary is expecting the funds and the funds are delivered to the beneficiary.   The beneficiary/recipient of the funds typically receives the funds without producing identity documents.

      3.     In a hawala system there is no recorded agreement or written contract for the transaction and no legal means of reclamation.   Rather, the deal is secured by the trust between the parties which is often forged through familial, ethnic, religious, regional, and/or cultural bonds, and which undergirds the "honor system" that the hawala requires.   Typically, a hawala network is quite extensive, involving the transfer of many types of currencies between various hawaladars in different cities/countries and across different continents, with the value of the money moving in a variety of directions from one city/country to another.   In addition, hawaladars in the same country often "pool" together bulk currency to effectuate an "order" from another hawaladar if the amounts they individually possess are insufficient to satisfy an order.

      4.     Each time a hawladar gives payment instructions and a transaction occurs, a debt is created.   Hawaladars typically maintain a running tally or balance sheet and settle their debts vis-à-vis one another on a regular basis.   Money inflows and outflows are generally kept in relative balance with respect to the total amount of money each hawaladar puts into the network. Settlement between hawaladars can occur in several ways.   Mostly, settlement occurs through monetary value being placed upon the "books" of a given hawaladar in either the hawaladar's home country or in another country designated by the hawaladar.   In other instances, hawaladars "settle up" with the receipt of goods, real estate, or other assets in lieu of money.

5.      Hawala networks engage in monetary transactions where the source of the money is legitimate and monetary transactions where the source of the money is illegitimate.

### Background

6.      Defendant YOSSI AVITAN ("AVITAN") was born in Israel and was a resident of the United States.

7.      Defendant ORI SAADON ("SAADON") was born in Israel and was a resident of Israel.

8.      Defendant ITZHAK SALAMA ("SALAMA") was born in Israel and was a resident of the United States.

9.      Defendant GOLAN CHKECHKOV ("CHKECHKOV") was born in Israel and was a resident of the United States.

10.     Defendant MICHAEL ADMON ("ADMON") was born in Israel and was a resident of the United States.

11.     Defendant HAVIV ARAZI ("ARAZI") was a citizen of Israel and was a resident of the United States.

12.     Person A ("Person A") was born in Israel and was a resident of Israel.

13.     Person B ("Person B") was born in Hungary and was a resident of Hungary.

14.     At all times relevant to this Indictment, defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON, and ARAZI were not registered with the Department of the Treasury, Financial Crimes Enforcement Network ("FinCEN"), as an operator, controller, manager, supervisor, director, and owner of a money transmitting business, as required by Title 31, United States Code, Section 5330, and its regulations thereunder, specifically, Title 31, Code of Federal Regulations, Section 1010, *et seq.*

15.     At all times relevant to this Indictment, defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON, and ARAZI were not licensed to operate a money transmitting business in the District of Columbia, as required by Title 26, D.C. Code, Section 1001, *et seq.*

16.     At all times relevant to this Indictment, defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON, and ARAZI were not licensed to operate a money transmitting business in New York, as required by N.Y. Banking Law, Section 641(1).

17.     At all times relevant to this Indictment, defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON, and ARAZI were not licensed to operate a money transmitting business in California, as required by California Financial Code, Section 2030.

18.     The defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON, and ARAZI, together with others known and unknown to the Grand Jury, were in the business of transmitting funds on behalf of the public in interstate commerce without the applicable State licenses and without having registered with FinCEN.   The monetary transfers in this case did not involve the physical or electronic transmissions of funds between locations in the United States and elsewhere.   Rather, the defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON, and ARAZI, together with others known and unknown to the Grand Jury, operated an informal value transfer system known as a "hawala" network.

### Money Transmitting Business Laws and Bank Secrecy Act Requirements

19.     The federal unlicensed money transmitting business statute, Title 18, United States Code, Section 1960, was enacted in order "to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises."

20.     Under Title 18, United States Code, Section 1960, it is against the law to conduct a money transmitting business: (a) without the appropriate state license (in a state that has a licensing requirement and criminalizes such unlicensed operation as a misdemeanor or felony); (b) failing to register with FinCEN within 180 days after the date the business was established; and (c) when a business otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or intended to be used to promote unlawful activity.   The majority of States, including the District of Columbia, New York, and California require money transmitting businesses to obtain a license and comply with other regulatory requirements that apply to such licensed entities, and punish the unlicensed operation of a money transmitting business as a misdemeanor or felony.

21.     The term "money transmitting" under Section 1960(b)(2) includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."   The term "State," under Section 1960(b)(3), includes the District of Columbia.

22.     In addition to being subject to the state licensing and federal registration requirements, money transmitting businesses are subject to provisions of the Bank Secrecy Act, codified in Title 31, United States Code, Sections 5311 through 5332.   The Bank Secrecy Act and its implementing regulations, Title 31, Code of Federal Regulations, Section 1010, *et seq.*, require, among other things, such businesses to take steps to avoid laundering the proceeds of crime and to report suspicious transactions to law enforcement authorities.

23.     Pursuant to Title 31, United States Code, Section 5313, and regulations thereunder, persons operating a financial institution, which includes money transmitting businesses, are required to prepare and file Currency Transaction Reports ("CTRs") to report

cash transactions involving the payment, receipt, or transfer of over $10,0000 in United States currency. In order to complete the CTRs, the persons or businesses filing such reports would be required to verify and record the name and address of the person presenting the transaction, and the identity, account number and social security or taxpayer identification number, if any, of the person or entity on whose behalf the transaction was to be effected.

24.     Pursuant to Title 31, United States Code, Section 5318(h), and the implementing regulations, Title 31, Code of Federal Regulation, Sections 1010, *et seq.*, money transmitting businesses must establish in writing an anti-money laundering program. Therefore, unlike ordinary businesses, money transmitting businesses have independent statutory and regulatory obligations to understand the nature and source of the funds they transmit, and to ensure systems are in place to detect and prevent transactions made with the proceeds of crime.

25.     District of Columbia law, Title 26, D.C. Code, Section 1002, provides that no person shall engage in the business of money transmission without obtaining a license. Title 26, D.C. Code, Section 1023(c), provides criminal penalties for operating a money transmitting business without a license.

26.     New York law, N.Y. Banking Law, Section 641(1), provides that no person shall engage in the business of receiving money for transmission or transmitting the same without obtaining a license. N.Y. Banking Law, Section 650 provides criminal penalties for operating a money transmitting business without a license.

27.     California law, California Financial Code, Section 2030, provides that no person shall engage in the business of money transmission in the State without a license unless exempt. California Financial Code, Section 2152 provides criminal penalties for operating a money transmitting business without a license.

## COUNT ONE

28.     The allegations set forth in paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference herein.

### The Conspiracy

29.     From on or about June 11, 2015, and continuing thereafter to on or about April 6, 2016, within the District of Columbia and elsewhere, defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON, and ARAZI, together with co-conspirators known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree together to commit offenses against the United States and to defraud the United States, in violation of Title 18, United States Code, Section 1960, to wit: to knowingly conduct, control, manage, supervise, direct and own all or part of an unlicensed money transmitting business which affected interstate and foreign commerce in any manner and degree, in the District of Columbia and elsewhere, and which:

a.      was operated without an appropriate money transmitting license in States where such operation is punishable as a misdemeanor or a felony under state law, whether or not the defendants knew that the operation was required to be licensed or that the operation was so punishable;

b.      was operated without registering with FinCEN as required by Title 31, United States Code, Section 5330, and regulations promulgated thereunder, specifically Title 31, Code of Federal Regulations, Section 1010, *et seq*.; and

c.      involved the transportation or transmission of funds that were known to the defendants to have been derived from a criminal offense.

### The Object of the Conspiracy

7

30.    It was the object of the conspiracy for the defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON, and ARAZI, together with co-conspirators known and unknown to the Grand Jury, to:

a.    conduct an unlicensed money transmitting business (in violation of 18 U.S.C. § 1960(a), (b)(1)(A), (B), and (C));

b.    defraud the United States; and

c.    obtain money by charging a fee for providing money transmitting services in interstate and foreign commerce.

### The Manner and Means of the Conspiracy

31.    To accomplish the objects of the conspiracy, defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON and ARAZI, together with co-conspirators known and unknown to the Grand Jury, used the following manners and means, among others:

a.    It was part of the conspiracy that defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON and ARAZI, together with co-conspirators known and unknown to the Grand Jury, conducted, controlled, managed, supervised, directed, and owned a money transmitting business which consisted of a network of individuals and entities, who secretly and anonymously transferred and transmitted money on behalf of the public through interstate and foreign commerce to recipients located in the United States and abroad, without obtaining the required State licenses and federal registration.

b.    It was further part of the conspiracy that defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON and ARAZI, together with co-conspirators known and unknown to the Grand Jury, operated as a money transmitting business as that term is defined in Title 18, United States Code, Section 1960(b)(2).

c.      It was further part of the conspiracy that defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON and ARAZI, together with co-conspirators known and unknown to the Grand Jury, solicited and caused to be solicited customers for their money transmitting business from members of the public located in the United States and elsewhere.

d.      It was further part of the conspiracy that defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON and ARAZI, together with co-conspirators known and unknown to the Grand Jury, advertised, advised, and acknowledged that members of the network could accept cash funds in various cities in the United States, including New York, New York and Los Angeles, California, for transfer to other cities in the United States, including the District of Columbia and overseas, for a fee.

e.      It was part of the conspiracy that defendants AVITAN, SAADON, SALAMA, and CHKECHKOV, beginning as early as June 1, 2015 and continuing through at least August 31, 2015, arranged for defendants SALAMA and CHKECHKOV, and others known and unknown, to receive cash funds on behalf of the public in New York, New York and Los Angeles, California.

f.      It was part of the conspiracy that defendants AVITAN, SAADON, CHKECHKOV, ADMON, and ARAZI, together with others known and unknown to the Grand Jury, arranged for cash funds that had been received in another State, to be delivered into the District of Columbia and elsewhere, minus a fee.

g.      It was part of the conspiracy that defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON and ARAZI, together with co-conspirators known and unknown to the Grand Jury, did not obtain a license in the District of Columbia, New York, or California, to operate a money transmitting business.

h.      It was part of the conspiracy that defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON and ARAZI, together with co-conspirators known and unknown to the Grand Jury, did not register the hawala network, or their portion of the hawala network, with FinCEN, as required by Title 31, United States Code, Section 5330, and the regulations promulgated thereunder.

i.      It was part of the conspiracy that defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON and ARAZI, together with co-conspirators known and unknown to the Grand Jury, failed to comply with Title 31, United States Code, Sections 5313 and 5330, and the regulations promulgated thereunder, by failing to implement any type of anti-money laundering program and "get to know your customer" program and by failing to file CTRs, after receiving cash money from the public in New York and California and delivering those funds, minus a fee, to individuals located in the District of Columbia and elsewhere.

j.      It was part of the conspiracy that defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON, and ARAZI, together with co-conspirators known and unknown to the Grand Jury, made efforts to conceal and hide their money transmitting business from the Federal and State governments by among other things, not having a "brick and mortar" business, making anonymous arrangements for monetary transactions, conducting monetary transactions on the street, accepting and delivering cash funds in plastic bags with no corresponding documentation, and failing to file CTRs with the Department of the Treasury.

**Overt Acts**

32.    In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed by or caused to be committed by one or more members of the conspiracy, in the District of Columbia and elsewhere:

a.    On or about the dates listed in the chart below, in furtherance of the conspiracy to operate as an unlicensed money transmitting business, defendants AVITAN, SAADON, SALAMA, CHKECHKOV, ADMON and ARAZI, together with other co-conspirators known and unknown to the Grand Jury, transferred and caused to be transferred the sums indicated.

| Date | Amount | From | To | Transaction Number ("TN-#") |
|------|--------|------|-----|------|
| On or about June 11, 2015 | $20,000 | Cash delivery from PERSON B in Brooklyn, New York | Defendant CHKECHKOV received funds in Brooklyn, New York | TN-1 |
| On or about June 11, 2015 | $20,000 | Cash returned from defendant CHKECHKOV in Brooklyn, New York | PERSON B received funds in Brooklyn, New York | TN-1 |
| On or about June 15, 2015 | $50,000 | Cash delivery from PERSON B in Brooklyn, New York | Defendant CHKECHKOV received funds in Brooklyn, New York | TN-2 |
| On or about June 25, 2015 | $47,000 | Cash returned from defendant ADMON in Brooklyn, New York | PERSON A received cash funds in Brooklyn, New York | TN-2 |
| On or about August 31, 2015 | $120,000 | Cash delivery from PERSON A in Tarzana, California | Defendant SALAMA received cash funds in Tarzana, California | TN-3 |

| On or about September 8, 2015 | $53,000 | Cash delivery from Defendant ARAZI in Washington, D.C. | PERSON A received cash funds in Washington, D.C. | TN-3 |
|---|---|---|---|---|
| On or about September 16, 2015 | $39,475 | Wire Transfer from account no. xxx7838 in Hong Kong | Funds received by PNC bank account no. xxxx9244 opened in Washington, D.C. | TN-3 |

## Transaction No. 1

b.      On or about June 11, 2015, PERSON B communicated with PERSON A, while both were in the District of Columbia and elsewhere, regarding moving $50,000 from the United States to the United Kingdom.

c.      On or about June 11, 2015, PERSON A advised PERSON B that PERSON A was arranging for two different individuals in New York to accept the $50,000 for transfer to the United Kingdom.   PERSON A gave PERSON B an Israeli telephone number to call regarding arrangement for delivery of $30,000 of the funds.   PERSON A also told PERSON B to wait for a call from someone regarding the remaining $20,000.

d.      On or about June 11, 2015, PERSON A, who was located in the District of Columbia, directed PERSON B to travel to New York to meet with defendant CHKECHKOV.

e.      On or about June 11, 2015, defendant CHKECHKOV called PERSON B to arrange for the delivery and transmission of $20,000.   PERSON B told defendant CHKECHKOV that PERSON B would be in New York around 12:00 p.m. or 1:00 p.m. that day and defendant CHKECHKOV told PERSON B to call him when PERSON B got to Brooklyn, New York.

      f.      On or about June 11, 2015, defendant CHKECHKOV told PERSON B to meet him at a specific address on East 40th Street, Brooklyn, New York.

      g.      On or about June 11, 2015, defendant CHKECHKOV met with PERSON B outside of a specific address on East 40th Street, Brooklyn, New York.  They went into a clothing business located in the basement area of the building and then moved upstairs to the residence area of the building where PERSON B delivered $20,000 to defendant CHKECHKOV. During the encounter, defendant CHKECHKOV explained that he would confirm the delivery with his contact.

      h.      On or about June 11, 2015, PERSON A communicated with PERSON B about delivering the remaining $30,000 to defendant CHKECHKOV.  PERSON B told PERSON A that this was not the agreement and that PERSON B wanted to take back the $20,000 and deliver the full $50,000 the next day to another group.

      i.      On or about June 11, 2015, PERSON B spoke with an individual who identified himself as "Avi" at an Israeli telephone number.  During that conversation, "Avi" told PERSON B that the money could be delivered in Manchester, United Kingdom, but PERSON B said that the location was not acceptable and that PERSON B wanted to deliver $50,000 on Monday.  "Avi" told PERSON B to go back to defendant CHKECKOV and pick up the $20,000, and that they would arrange for someone else to pick up the money on Monday.

      j.      On or about June 11, 2015, while PERSON B was on the telephone with "Avi," PERSON B received an incoming telephone call from a United Kingdom telephone number.  PERSON B called that telephone number and spoke to an unknown male with a British accent concerning the pick-up of funds in the United Kingdom.

k.      On or about June 11, 2015, PERSON B called defendant CHKECHKOV and told him that PERSON B was instructed by others to go back and pick up the $20,000.

l.      On or about June 11, 2015, defendant CHKECHKOV spoke with PERSON B, regarding return of the money and about possible future business and asked PERSON B what percentage PERSON B normally paid to transfer funds. PERSON B told defendant CHKECHKOV, "four percent," and asked defendant CHKECHKOV how much he charged.   Defendant CHKECHKOV responded that he charged about the same.

m.      On or about June 11, 2015, after making arrangements with defendant CHKECHKOV, PERSON B went to Brooklyn, New York, and met with defendant CHKECHKOV.

n.      On or about June 11, 2015, defendant CHKECHKOV gave PERSON B back the $20,000 and stated that he was available to conduct business with PERSON B in the future and that he could delivery money in any country.

**Transaction No. 2**

o.      On or about June 12, 2015, defendant CHKECHKOV called PERSON B and stated that another individual named "Moshe" said that defendant CHKECHKOV would handle the entire $50,000, but defendant CHKECHKOV did not want $20 bills.

p.      On or about June 13, 2015, PERSON A told PERSON B that PERSON A was making the arrangements for delivery of $50,000 in New York on Monday, June 15, 2015. PERSON A also told PERSON B that PERSON A could not control where the money was dropped off, because it was up to someone in Israel.

q.      On or about June 14, 2015, PERSON A, who was located in the District of Columbia, notified PERSON B that the delivery of the $50,000 might be to the same individual as before, *i.e.*, defendant CHKECHKOV.

r.      On or about June 15, 2015, at PERSON A's direction, PERSON B traveled from Washington, D.C. to New York and contacted defendant CHKECHKOV, who directed PERSON B to go to a specific address on Eastern Parkway, Brooklyn, New York.

s.      On or about June 15, 2015, PERSON B met defendant CHKECHKOV in front of a building and gave defendant CHKECHOKOV a bag that contained $50,000 in cash. Defendant CHKECHKOV told PERSON B that the next time he wanted to transfer money, PERSON B should bypass the other individuals and come directly to defendant CHKECHKOV because his office was everywhere.

t.      On or about June 15, 2015, defendant CHKECHKOV telephoned PERSON B and asked PERSON B how much extra PERSON B was told the charge would be for delivering $20 bills.   PERSON B informed defendant CHKECHKOV that PERSON B was told a half percent more.

u.      On or about June 15, 2015, PERSON B spoke to an unknown individual on the telephone and told the unknown individual that PERSON B needed $50,000 in London on Wednesday, June 17, 2015.

v.      On or about June 16, 2015, defendant CHKECHKOV told PERSON B that he (defendant CHKECHKOV) was only responsible for getting the money to Israel and that he was not sure who was responsible for getting the money to the United Kingdom.

w.      Between on or about June 16, 2015, and on or about June 25, 2015,
PERSON A contacted defendant SAADON multiple times to seek the return of the $50,000.
Defendant SAADON told PERSON A to use an alias to identify himself for the cash pick-up.

x.      Between approximately June 16, 2015, and on or about June 25, 2015,
defendant AVITAN made arrangements for PERSON A to receive the money in New York,
minus a fee.

y.      On or about June 25, 2015, defendant AVITAN told PERSON A to go to a
location in New York, New York to have the $50,000 returned.   Defendant AVITAN then told
PERSON A that he could call in an hour and give PERSON A the exact location for the pick-up.
Later that morning, defendant AVITAN told PERSON A to go to Borough Park, New York and
to call "Michael" at a specific number.

z.      On or about June 25, 2015, PERSON A called "Michael" and confirmed
the meeting location.

aa.     On or about June 25, 2015, PERSON A called "Michael" when he got to
the meeting location and was told that someone would deliver the money.   PERSON A told
Michael that he did not want to conduct the money transaction on the street.   After some
discussion, "Michael" provided PERSON A with a specific address on 52nd Street, Brooklyn,
New York.

bb.     On or about June 25, 2015, PERSON A arrived at the location on 52nd
Street, Brooklyn, New York, provided by "Michael" which appeared to be a computer repair
business.

cc.     On or about June 25, 2015, PERSON A met with defendant ADMON
along with at least two other unknown males.   Defendant ADMON threw a bag containing

$47,000 in cash on the floor, which PERSON A picked up.   PERSON A was given an envelope to conceal the bag of cash.   Defendant ADMON told PERSON A that he did not have a name, that PERSON A did not know him, and that defendant ADMON did not know PERSON A, and then asked PERSON A whether PERSON A understood.

        dd.     On or about June 25, 2015, PERSON A told defendant SAADON that PERSON A had picked up the funds.

### Transaction No. 3

        ee.     On or about August 28, 2015, PERSON A contacted defendant SAADON about moving $120,000 from Los Angeles to another location within the United States. Defendant SAADON originally agreed to assist PERSON A to transmit $120,000 from Los Angeles to Atlanta, Georgia, but later informed PERSON A that delivery in Atlanta was not possible.

        ff.     On or about August 30, 2015, PERSON A contacted defendant SAADON concerning moving the $120,000.

        gg.     On or about August 30, 2015, defendant SAADON sent a responsive text message indicating that PERSON A would be contacted the next day by someone in Los Angeles to move the money.

        hh.     On or about August 31, 2015, defendant SAADON contacted PERSON A and provided PERSON A with a telephone number.   Thereafter, PERSON A spoke to defendant SALAMA who requested that PERSON A meet him at a specific address on Ventura Boulevard in Tarzana, California.

ii.     On or about August 31, 2015, PERSON A was driven to the specific address, which contained a CVS store and parking lot.   PERSON A walked through the parking lot and entered a blue Kia minivan that was being driven by defendant SALAMA.

jj.     On or about August 31, 2015, defendant SALAMA drove a short distance away and parked.   PERSON A handed defendant SALAMA $120,000 in cash, which defendant SALAMA counted.

kk.     On or about August 31, 2015, defendant SALAMA and PERSON A discussed how to launder money, the transfer of money to various cities and the possibility of future monetary transactions.

ll.     On or about September 2, 2015, PERSON A asked defendant SAADON about receiving the $120,000 in Atlanta.   Defendant SAADON indicated that he might not be able to transfer the entire amount, but agreed to work on it immediately.   PERSON A provided defendant SAADON with an account number in which to have a portion of the funds deposited. Defendant SAADON indicated that the funds might be wired from China, Europe or Israel.

mm.     On or about September 2, 2015, defendant SAADON told PERSON A that PERSON A would receive a call within two to three hours from someone who would provide $50,000 to $60,000 of the $120,000 in cash and that the rest would be wired to the bank account number that PERSON A had provided.

nn.     On or about September 3, 2015, PERSON A received a call from defendant AVITAN.   Defendant AVITAN told PERSON A that he was coordinating the transfer of the $120,000 for defendant SAADON.   Defendant AVITAN told PERSON A he could get the money to PERSON A in Atlanta or Washington, D.C., however the amount would only be a portion – around $50,00 to $54,000 at the time, and the remaining balance would have

to be wired.   Defendant AVITAN and PERSON A scheduled the delivery of cash to PERSON A in Washington, D.C. for September 8, 2015.   Defendant AVITAN instructed PERSON A to call him around noon on September 7, 2015 to confirm the delivery time.

oo.    On or about September 7, 2015, PERSON A called defendant AVITAN who gave PERSON A a telephone number associated with a Brooklyn, New York area code and told PERSON A to call the number the next day.   Defendant AVITAN told PERSON A that the name of the person making the delivery was "Habib."

pp.    On or about September 8, 2015, PERSON A, who was in Washington, D.C. at the time, received a text from the number given by defendant AVITAN concerning the meeting with PERSON A for the cash delivery.

qq.    On or about September 8, 2015, as directed, PERSON A went to the intersection of Pennsylvania Avenue, N.W. and 6th Street N.W., Washington, D.C.   A white Ford F-350 van with New Jersey plates stopped at the intersection and the driver, defendant ARAZI, motioned PERSON A to enter the van.

rr    On or about September 8, 2015, defendant ARAZI told PERSON A that he worked as a carpet cleaner as well as a driver picking up and delivering money for defendant AVITAN and another individual.   Defendant ARAZI explained that he was late to meet PERSON A because he had to make an earlier delivery of money to someone else and was running behind schedule.

ss.    On or about September 8, 2015, defendant ARAZI gave PERSON A a plastic bag from the middle center console of the van.   The center console contained several stacks of cash.   Inside the plastic bag which defendant ARAZI provided to PERSON A was $53,000 in cash.

tt.     On or about September 16, 2015, defendant SAADON notified PERSON A that a wire transfer was sent to the account number that PERSON A had provided for another portion of the $120,000 that had been delivered to defendant SALAMA in California.

uu.     On or about September 16, 2015, the bank account located in Washington, D.C. that PERSON A provided to defendant SAADON received $39,475 from a bank account in Hong Kong.

vv.     On or about November 2015, defendant AVITAN, defendant SALAMA, PERSON A and other individuals known and unknown to the Grand Jury met in Miami, Florida and discussed, among other things, the transfer of other funds using the hawala network and the remaining approximately $20,000 that was never delivered to PERSON A from the $120,000 delivery to defendant SALAMA.

ww.     Between on or about September 16, 2015 and on or about April 4, 2016, PERSON A discussed the remaining $20,000 with defendants SAADON, SALAMA, and AVITAN.

**(Conspiracy to Operate an Unlicensed Money Transmitting Business,
in violation of 18 U.S.C. §§ 2, 371, 1960(a)).**

## FORFEITURE ALLEGATION

1.     Upon conviction of any of the offense alleged in Count One, the defendants shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1).   The United States will also seek a forfeiture money judgment equal to the value of any property, real or personal, involved in the offense, or any property traceable to such property.

2.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 982(a)(1), and Title 21, United States Code, Section 853(p))**

A TRUE BILL:


FOREPERSON.

_Channy D. Phillips /Ace_

ATTORNEY OF THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA